UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Chris Maurice Welch,<br><br>Defendant. | Case No. 17-cr-0251 (ADM/HB)<br><br>**REPORT AND RECOMMENDATION** |

Jeffrey S. Paulsen, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for United States of America

Shannon R. Elkins, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Chris Maurice Welch

HILDY BOWBEER, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motions hearing on November 15, 2017. The case has been referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. In this Report and Recommendation, the Court will address Defendant Chris Maurice Welch's Pretrial Motion to Suppress Search and Seizure [Doc. No. 22]. Defendant's nondispositive motions were addressed in a separate Order [Doc. No. 30]. For the reasons set forth below, the Court recommends that Defendant's motion to suppress be denied.

**I.   Procedural Background**

On September 27, 2017, Chris Maurice Welch was charged by Indictment with

Felon in Possession of a Firearm – Armed Career Criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).  (Indictment [Doc. No. 1].)  Defendant filed pretrial motions, including the motion to suppress, on October 25, 2017.  He originally sought to suppress all evidence seized from the search of 3xxx Aldrich Avenue North, Minneapolis, Minnesota, on March 27, 2017, on the following grounds: (1) as an overnight guest, he had a reasonable expectation of privacy in the home; (2) the search warrant lacked probable cause; and (3) the police did not conduct a controlled buy or otherwise corroborate information obtained from a confidential informant that Defendant was selling marijuana.  (Def. Mot. Suppress at 1–2 [Doc. No. 22].)  Defendant also moved to suppress physical and forensic evidence obtained from a buccal swab.  (*Id.*)  At the pretrial motion hearing, Defendant withdrew the portion of his motion seeking to suppress evidence seized from the Aldrich Avenue home and told the Court he was seeking to suppress only the seizure of his DNA from the buccal swab.  (Mot. Hr'g Tr. 4:4–15 [Doc. No. 32].)

The Government submitted two exhibits into evidence at the hearing: a packet of photographs taken inside the Aldrich Avenue home (Gov't Ex. 1) and a recorded statement (Gov't Ex. 2).  Defendant submitted a photograph as evidence (Def. Ex. 1). Minneapolis Police Officer Jeffrey Werner testified for the Government.

After requesting and receiving an extension of time to file his post-hearing memorandum, Defendant filed a memorandum in support of his motion to suppress on December 13, 2017 [Doc. No. 37].  The memorandum confirms that Defendant is seeking to suppress only the DNA evidence seized on March 27, 2017.  He argues the DNA

evidence was seized without his permission or lawful authority, in violation of the Fourth Amendment. The Government filed its post-hearing memorandum on December 18, 2017 [Doc. No. 38], and the Court took the motion to suppress under advisement on that date.

## II.     Relevant Facts

Officer Werner obtained information from a confidential informant (CI) that Defendant was storing drugs and weapons at, and selling drugs from, 3xxx Aldrich Avenue North. (Mot. Hr'g Tr. 7: 21–25, 8:1–3.) The CI had personally seen Defendant with drugs and weapons inside the residence within the past seventy-two hours. (*Id.* 8:4–6.) The CI described the person as having a medium build and a medium afro, and identified him as Chris Welch. (*Id.* 8:10–14; Def. Ex. A at 2.[1]) Officer Werner entered the name on the Minnesota Department of Motor Vehicles website and located an individual who matched the description given by the CI. (Mot. Hr'g Tr. 8:19–21.) He showed a photograph of Defendant to the CI, who confirmed the person in the photograph as the person whom he knew to be storing drugs and guns at 3xxx Aldrich Avenue North. (*Id.* 8:21–24.)

Officer Werner further corroborated the information from the CI by conducting surveillance of 3xxx Aldrich Avenue North. (*Id.* 9:2.) He observed heavy foot traffic and short-term vehicle traffic that, in his experience, signified narcotics activity. (*Id.*

---

[1] Defendant attached Exhibit A (the search warrant and supporting affidavit) to his post-hearing memorandum. Ordinarily, the Court would not permit a party to submit evidence after the evidentiary hearing without notice to the other party and leave of Court. However, the Government did not object in its post-hearing memorandum to the Court's consideration of Exhibit A, and the Court finds it would be helpful to consider it.

3

9:3–7.) A fellow officer, Officer Schroeder, also conducted surveillance at of 3xxx Aldrich Avenue North and observed Defendant and another person sitting inside a vehicle parked in the driveway of 3xxx Aldrich Avenue North. (*Id.* 9:11–25, 10:1.)

Upon further investigation, Officer Werner learned that Defendant had been convicted of felony first-degree aggravated robbery in 2002 and felony third-degree narcotics in 2014. (Def. Ex. A at 2.) Officer Werner therefore knew that Defendant was prohibited from possessing a firearm. (*Id.*)

Officer Werner obtained a search warrant for 3xxx Aldrich Avenue North, which was executed on March 27, 2017. (*Id.* 10:2–8.) Defendant was inside the home when the warrant was executed. (*Id.* 10:17–19.) Two other males, a female, and two children were also inside the home. (*Id.* 10:13:15.) Officers entering the home found Defendant and the other two men in a bedroom, along with three cellphones that had been broken in half and damaged. (*Id.* 11:25, 12:1–6.) Officer Werner believed the phones had been broken and damaged to prevent law enforcement from retrieving text messages, data, pictures, and other information that could link the three men to criminal activity. (*Id.* 12:7–11.)

Other officers executing the search warrant discovered four firearms in a kitchen closet, a large amount of synthetic marijuana, some of which was packaged for sale, and digital scales. (*Id.* 12:17–22; Gov't Ex. 2.) The guns were in plain view, and the baggies of marijuana and digital scales were in a kitchen cabinet. (Mot. Hr'g Tr. 14:20–21, 14:24–25, 15:1–2.) Defendant was arrested for probable cause-weapons and probable cause-narcotics. (*Id.* 15:7–12.) Because he was a convicted felon, he was not allowed to have access to guns. (*Id.* 15:13–16.)

Meanwhile, as the search warrant was being executed, officers outside the home encountered several people sitting in a car parked directly in front of the house. (*Id.* 19:4–6, 19:14-16.) The officers discovered marijuana and a loaded handgun inside the car. (*Id.* 19:10–11.) In light of all the circumstances and his experience, Officer Werner concluded they were there to buy narcotics or had just purchased narcotics. (*Id.* 19:17–21.)

After Defendant was arrested, Officer Werner interviewed him in one of the bedrooms. (*Id.* 15:17–20.) Defendant's hair was in "long braids." (*Id.* 24:6–8.) The interview began with Officer Werner advising Defendant of his *Miranda* rights and Defendant agreeing to speak with him. (*Id.* 16:24–25, 17:1–4.) Defendant is not challenging the admissibility of his subsequent statements, and the Court will not recount them fully here. Essentially, Defendant told Officer Werner that he did not know anything about the guns and drugs, and he was just visiting the home with his friend, who was the homeowner's cousin. (*Id.* 17:11-20.) Defendant said he had been there at a party the previous night and had not seen any guns. (Gov't Ex. 1.)

Officer Werner told Defendant that it was "customary" to obtain a DNA sample when a search warrant is executed, firearms are discovered, and people are present in the home. (Mot. Hr'g Tr. 17:25, 18:1–3.) Defendant said his DNA was already in the system from three previous buccal swabs taken in connection with child support proceedings, but he did not object to Officer Werner collecting his DNA. (*Id.* 18:4–23; Gov't Ex. 1.) No transcript of this interview is available, and the sound quality of the recording provided to the Court is poor, but it is evident from Defendant's and Officer

5

Werner's voices and laughter that Defendant was cooperative and Officer Werner was not threatening.

### III.   Discussion

#### A.   Defendant's Arrest Was Supported by Probable Cause

Defendant argues there was no probable cause to arrest him. "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Torres-Lona*, 491 F.3d 750, 756 (8th Cir. 2007). "In dealing with probable cause, . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175. In addition, probable cause may be "based on the collective knowledge of all the officers involved." *United States v. Briley*, 726 F.2d 1301, 1305 (8th Cir. 1984).

Here, the arresting officers knew Defendant was a convicted felon, and they found him in a house containing a large amount of synthetic marijuana and four guns. There were several broken and damaged cell phones located in the bedroom with Defendant and the other two men, indicating that criminal activity was afoot. The arresting officers also knew that a CI had informed Officer Werner a few days before that Defendant was storing drugs and weapons at, and selling drugs from, 3xxx Aldrich Avenue North, and that the CI had personally seen Defendant with the drugs and weapons.[2] Finally, Officer

---

[2] Defendant makes much of the difference in hairstyles between the individual described by the CI, who was described as having a medium afro, and the photograph and current

6

Werner had recently observed short-term traffic consistent with drug activity at the residence.  These facts and circumstances gave the arresting officers probable cause to believe that Defendant was committing or had committed a criminal offense.

### B. Defendant Voluntarily Consented to the Buccal Swab

Defendant argues the DNA sample should be suppressed because Officer Werner did not obtain a search warrant and because Defendant was not told he could refuse to consent to the swab.  Once an individual provides voluntary consent for a buccal swab, the officer does not need a warrant or probable cause to proceed with the collection of his DNA.  *See United States v. Cloud*, No. 10-cr-0047 (RHK/RLE), 2010 WL 2301537, at *2-3 (D. Minn. Apr. 19, 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 746 (8th Cir. 2002)), *R. & R. adopted*, 2010 WL 2301534 (D. Minn. June 4, 2010).  Voluntariness is measured by a number of different factors, including the characteristics of the individual and the context and environment of the consent.  *See United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).  Whether the officer advises the individual that he had the right to refuse to consent is one of these factors, but is not alone dispositive.  *See id.*

The Court finds that Defendant's consent to the buccal swab was voluntary.  As to Defendant's personal characteristics, his age (thirty-two years old), general intelligence, presumed sobriety at the time of consent, familiarity with the criminal justice system, and

---

appearance of Defendant, with hair in braids.  The Court observes, as a matter of common sense, that a hairstyle can be changed in less than a day, and further concludes in light of the other corroborating evidence of identity that such a change in hairstyle is not so significant as to invalidate the CI's description of Defendant or otherwise cast doubt on the credibility of the CI.

previous experience with buccal swabs favor a finding of voluntariness. *See id.* On the other hand, while Defendant was not told he had no choice in the matter, neither was he informed of his right to refuse consent. *See id.* As to the surrounding environment, Defendant had not been detained or questioned long, and he was not subjected to threats, intimidation, or punishment. *See id.* Similarly, he did not rely on any promises or misrepresentations, and he did not object to the swab. *See id.* On the other hand, Defendant was under arrest when he gave consent, and the consent did not occur in a public place. *See id.* Balancing the relevant considerations, the Court finds that the totality of the circumstances supports a finding of voluntariness.

### C. Alternatively, Defendant's DNA Would Have Been Obtained During the Booking Process

Even if Defendant's consent was not voluntary, his DNA would have been obtained inevitably during the booking process. (Mot. Hr'g Tr. at 20:24–25, 21:1-14.) *See United States v. Eastman*, 256 F. Supp. 2d 1012, 1021–22 (D.S.D. 2003). Defendant does not disagree. (Def. Mem. Supp. Mot. Suppress at 10.)

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Chris Maurice Welch's Pretrial Motion to Suppress Search and Seizure [Doc. No. 22] be **DENIED**.

Dated: January 2, 2018            s/ *Hildy Bowbeer*
                                               HILDY BOWBEER
                                               United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.