**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

Plaintiff,

v.

Chris Maurice Welch,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Criminal No. 17-251 ADM/HB

---

Jeffrey S. Paulsen, Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

Shannon R. Elkins, Esq., Office of the Federal Defender, Minneapolis, MN on behalf of Defendant Chris Maurice Welch.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Defendant Chris Maurice Welch's ("Welch") Objection [Docket No. 42] to Magistrate Judge Hildy Bowbeer's January 2, 2018 Report and Recommendation [Docket No. 40] ("R&R"). Judge Bowbeer recommends denying Welch's Pretrial Motion to Suppress Search and Seizure [Docket No. 22]. Based on a de novo review of the record, Welch's Objection is overruled and the R&R to deny Welch's suppression motion is adopted.

## II. BACKGROUND

In March 2017, a confidential informant ("CI") told Minneapolis Police Officer Jeffrey Bernard Werner ("Officer Werner") that Welch was storing guns and drugs in a home on 33XX Aldrich Avenue North, and that he was also selling drugs from that address. Hr'g Tr. [Docket No. 32] at 7–8. The CI told Officer Werner that within the past 72 hours he had been in the home where he personally witnessed Welch storing guns and drugs. Id. at 8. The CI described

Welch as "a black male about 30–35 years old, about 6'0 tall with a medium build and medium afro." Def.'s Mem. Supp. Mot. Suppress [Docket No. 37] Ex. A ("Def.'s Ex. A") at 2.

To verify this information, Officer Werner entered Welch's name in the Minnesota Department of Motor Vehicle website and found an individual whose description matched the description given by the CI. Hr'g Tr. at 8. Officer Werner showed the CI a photograph of Welch, and the CI identified the person in the photo as the person he had witnessed storing drugs and guns inside the Aldrich Avenue residence. Id. at 8, 24. Welch's driver's license information shows that he is a black male, 32 years old, 6'1" tall, and 196 pounds. See Def.'s Mot. Franks Hr'g [Docket No. 24] Ex. C. His driver's license photos show him wearing his hair in different styles, including with and without braids. Id.

Officer Werner investigated Welch's criminal history and discovered that Welch had been convicted of felony first-degree aggravated robbery in 2002 and felony third-degree narcotics in 2014. Def.'s Ex. A at 2. This information gave Officer Werner the knowledge that Welch was prohibited from possessing a firearm. Id.

Officer Werner further corroborated the CI's information by performing surveillance on the Aldrich Avenue residence. Hr'g Tr. at 9. He observed people approach the home on foot and in vehicles, enter the home, and leave a short time later. Id. This traffic pattern led Officer Werner to believe that drugs were being sold from within the home. Id. Another officer, Officer Schroeder, also conducted surveillance of the home and observed Welch and another person sitting inside a vehicle that was parked in the home's driveway. Id. at 8–9.

On the morning of March 27, 2017, Officer Werner obtained a search warrant for the Aldrich Avenue residence. See Def.'s Ex. A at 4. Also that morning, law enforcement followed

Welch from his probation officer's office in St. Paul to the Aldrich Avenue address. Hr'g Tr. at 10, 26. After Welch had entered the home, a SWAT team executed the search warrant. Id. at 10.

While the search was occurring inside the home, law enforcement officers outside the residence encountered two men in a car parked directly in front of the home. Id. at 19, 26–27. Officers found marijuana and a loaded handgun in the car. Id. at 19, 26–27. Based on his experience as a narcotics officer, Officer Werner concluded that the men were there to buy drugs. Id. at 19, 26–27.

Inside the home, law enforcement officers found the woman who rented the home, along with her two children. Id. at 11. Welch and two other men were also present inside a bedroom. Id. at 11–12. In the bedroom with the three men were three cell phones; each phone had been broken in half. Id. at 12. Officer Werner surmised the phones had been broken to prevent retrieval of text messages and other incriminating evidence that could link the men to criminal activity. Id.

The search of the home resulted in the discovery of four guns in a kitchen closet, as well as a large amount of synthetic marijuana—some packaged for sale—and digital scales located inside a kitchen cabinet. Id. at 12, 14–15. Welch was arrested for probable cause-weapons and probable cause-narcotics. Id. at 15. At the time of his arrest, Welch was wearing his hair in long braids. Id. at 24; Def.'s Mot. Franks Hr'g Ex. B.

After Welch had been arrested and handcuffed, Officer Werner interviewed him in one of the bedrooms. Hr'g Tr. at 15, 23, 28. The interview began with Officer Werner advising Welch of his Miranda rights and Welch agreeing to speak with him. Id. at 16–17. During the interview,

which was audio recorded,[1] Officer Werner asked, "You're a felon, correct, so you're not allowed to touch any guns?" Gov't Ex. 1 at 3:10. Welch agreed. Id. The conversation continued:

> Werner: Okay, well it's customary too, is when we do a search warrant and find guns in the house, we try to take DNA of everyone that's in the house. So . . .
>
> Welch: Okay, well my DNA is already in the system.
>
> Werner: I know, but we've got to take one anyway. (inaudible) So you're cool with me taking your DNA sample real quick? (inaudible) So you've had this done before and stuff?
>
> Welch: Yeah, I've done like three of them before (inaudible) DNA for kids.
>
> Werner: Oh, for child support stuff?
>
> Welch: Yeah (laughs).
>
> Werner: Funny (inaudible) (laughs). You weren't on Maury were you?
>
> Welch: (Inaudible) Not yet anyway.

Id. at 3:20–4:04. Following this exchange, Officer Werner then obtained Welch's DNA with a buccal swab. Welch was not told that he could refuse to provide a DNA sample.

On September 27, 2017, Welch was charged by Indictment with Felon in Possession of a Firearm – Armed Career Criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Indictment [Docket No. 1]. Welch moved to suppress the DNA sample taken from him at the time of his arrest, arguing that officers did not have probable cause to arrest him and that the

[1] The audio recording of the interview was introduced as Government's Exhibit 1 at the hearing on the motion to suppress and is referenced in this Order as "Gov't Ex. 1."

officers obtained his DNA without his consent. Welch argues that the DNA sample must be suppressed as the fruit of his unlawful arrest.

The R&R concluded that: (1) probable cause existed for Welch's arrest; (2) Welch voluntarily consented to the buccal swab; and (3) even if the consent was not voluntary, Welch's DNA would have inevitably been obtained during the booking process. The R&R thus recommends denying Welch's motion to suppress. Welch objects to the R&R's conclusions and recommendation.

## III. DISCUSSION

### A. Standard of Review

A district judge may refer a defendant's motion to suppress evidence to a magistrate judge for recommendation. Fed. R. Crim. P. 59(b)(1). The district judge must make an independent, de novo determination of those portions of the report and recommendation to which a party objects. Fed. R. Crim. P. 59(b)(3); 28 U.S.C. § 636(b)(1)(C); D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### B. Welch's Objections

#### 1. Probable Cause

Welch objects to the R&R's conclusion that there was probable cause to arrest him. He argues that the R&R ignored factors that help negate a finding of probable cause. Specifically, Welch contends that the CI's descriptions of Welch as having a medium afro and medium build were not accurate, and his mere presence in the Aldrich Avenue home the morning of the search did not provide officers with probable cause to arrest him.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." To be constitutionally valid, a warrantless arrest must be based on probable cause. Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause exists to make a warrantless arrest when, at the moment of the arrest, the collective knowledge of the officers involved was 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" United States v. Wajda, 810 F.2d 754, 758 (8th Cir. 1987) (quoting Beck, 379 U.S. at 91). "[P]robability, and not a prima facie showing, of criminal activity is the standard of probable cause." Illinois v. Gates, 462 U.S. 213, 235 (1983) (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). The probable cause determination is a "practical, commonsense, and non-technical determination." United States v. Reiner Ramos, 818 F.2d 1392, 1394 (8th Cir. 1987) (internal quotations omitted). The facts must be analyzed for their cumulative effect in the totality of the circumstances, rather than in isolation. Id.

Here, the totality of the circumstances established probable cause to believe that Welch had committed a crime. A CI told officers that he had witnessed Welch storing drugs and guns inside the Aldrich Avenue residence and selling drugs from the home. The CI verified that the person he had seen in the home matched Welch's driver's license photograph. The CI's information was corroborated by Officer Werner's observation of foot and vehicle traffic consistent with drug activity at the residence, and by Officer Schroeder's sighting of Welch in the home's driveway the night before the search warrant was obtained. On the day of the search, two men parked directly in front of the residence were found to have marijuana and a loaded handgun in their car. When officers searched inside the home, they found Welch and two other

men in a bedroom with three phones that had been broken in half. Four guns and a large amount of synthetic marijuana were also found inside the home. Officer Werner knew that Welch, as a felon, was not allowed to possess a firearm. These circumstances established ample probable cause to believe that Welch had committed a crime.

Welch argues that the CI's inaccurate description of him as having a medium afro and medium build casts doubt on whether there was probable cause to arrest Welch, because Welch has a thin build and was wearing his hair in braids at the time of arrest. This argument fails for multiple reasons. First, the CI confirmed that the person in Welch's drivers license photo was the person the CI had witnessed storing drugs and guns inside the Aldrich Avenue residence. Additionally, the difference in Welch's hairstyle—which can be quickly changed—is not so significant as to invalidate the CI's description of Welch or cast doubt on the CI's credibility. Further, the picture of Welch at the time of his arrest suggests a medium build, and his driver's license stating that he is 6'1" and 196 pounds further confirms this information.

Welch also argues that his presence in the Aldrich Avenue home at the time of the search was not a sufficient reason to arrest him because he was merely a guest and was not near the drugs and firearms found in a kitchen cabinet and closet out of plain view. Welch contends that "[t]o simply arrest everyone present is an abuse of law enforcement's arresting powers." Obj. at 9. This argument conveniently overlooks that Welch was one of three men found in a bedroom with three destroyed cell phones. These circumstances, when combined with the CI's statement that he had seen Welch storing guns and selling drugs in the home, justifies the arrest of Welch at the home.

**2. Consent**

Welch also objects to the R&R's conclusion that he voluntarily consented to a buccal swab. "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), cert. denied, 537 U.S. 1022 (2002). Thus, when an individual voluntarily consents to a buccal swab, no warrant or probable cause is required to proceed with the swab. United States v. Cloud, No. 10-47, 2010 WL 2301537, at *2–3 (D. Minn. Apr. 19, 2010) (quoting Pennington, 287 F.3d at 746), R&R adopted, 2010 WL 2301534 (D. Minn. June 4, 2010).

Whether a person's consent is voluntary depends on the totality of the circumstances, including the characteristics of the person giving consent and the details of the interrogation. United States v. Chaidez, 906 F.2d 377, 380–81 (8th Cir. 1990). Relevant characteristics of the person giving consent include the person's age, general intelligence and education, whether they were intoxicated when consenting, whether they were informed of their right to withhold consent or of their Miranda rights, and whether they had been previously arrested and thus familiar with the protections afforded to suspected criminals. Id. at 381. Factors relevant to the context in which consent was given include whether the person who consented was detained and questioned for a long or short time; was threatened, physically intimidated, or punished by the police; relied upon promises or misrepresentations made by the police; was in custody or under arrest when the consent was given; was in a public or a secluded place; and whether the person objected to the search or stood by silently while the search occurred. Id.

Here, Welch is in his thirties and there is no argument that he lacks intelligence or was intoxicated when he was arrested. He had been informed of his Miranda rights, and had been

arrested multiple times previously. Welch was also familiar with providing DNA samples through buccal swabs because he had done so three times in the past. Thus, Welch's individual characteristics all support a finding that his consent was voluntary.

As to the context and details of the interrogation, Welch was under arrest at the time he gave consent, but he had been detained and questioned for only a short time. The DNA sample was obtained three minutes after the interview began. See generally Gov't Ex. 1. Additionally, Welch was not threatened or physically intimidated by the police. To the contrary, the audio recording establishes that the tone of the interview was calm and cordial. See id. Officer Werner did not raise his voice or threaten Welch, and Welch responded to questions cooperatively and in a steady voice, even chuckling at times. Id. at 3:50–4:05. Further, Welch did not object to providing a DNA sample. Rather, he merely told Officer Werner that his DNA was already in the system. When Officer Werner asked if Welch was "cool with" providing a DNA sample, Welch complied without hesitation. Id. at 3:34. Thus, the context and details of the interrogation also favor a finding that Welch voluntarily consented to the swab process.

Welch next argues that Officer Werner left him with no choice but to comply by falsely implying that a DNA warrant was not needed to proceed with the buccal swab. Officer Werner told Welch that it was "customary" to take a DNA sample of everyone who is in the house where guns are found, and that even though Welch's DNA was already in the system "we've got to take one anyway." Id. at 3:20–3:35. Welch contends that these statements amounted to a false claim of lawful authority to which Welch acquiesced. The Court disagrees. Almost immediately after telling Welch "we've got to take [a DNA sample] anyway," Officer Werner sought Welch's consent by asking, "So you're cool with me taking your DNA sample real quick?" Id. at

3:30–3:40. Additionally, Welch had been read his Miranda rights less than three minutes earlier and, and as noted above, Welch had significant past experience with the criminal justice system and with providing DNA samples. The R&R correctly concluded that Welch's consent was voluntary.

**3. Inevitable Discovery**

The R&R alternatively concluded that even if Welch's consent had not been voluntary, Welch's DNA would inevitably have been obtained during the booking process. R&R at 13–14. Welch objects, arguing that if he had not been illegally arrested he would not have been in custody and available for the buccal swab. This argument is flawed because Welch was lawfully arrested. Therefore, officers could have obtained a DNA sample without a warrant as part of the booking procedure. See Maryland v. King, 569 U.S. 435, 466 (2013) "[A]nalyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment."). Because Welch's DNA sample inevitably would have been discovered, it need not be suppressed. See Nix v. Williams, 467 U.S. 431, 447–48 (1984) (holding that evidence that inevitably would have been discovered need not be suppressed); United States v. Eastman, 256 F. Supp. 2d 1012, 1021–22 (D.S.D. 2003) (denying motion to suppress buccal swab evidence because it inevitably would have been discovered).

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Chris Maurice Welch's Objection [Docket No. 42] to the January 2, 2018 Report and Recommendation is **OVERRULED**;

2. The Report and Recommendation [Docket No. 40] is **ADOPTED**; and

3. Welch's Pretrial Motion to Suppress Search and Seizure [Docket No. 22] is **DENIED.**

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: February 7, 2018.